**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SPARROW FUND MANAGEMENT, LP,<br><br>Plaintiff,<br><br>vs.<br><br>MIMDEX GROUP, INC., PARKER H.<br>"PETE" PETIT and JOHN DOES 1-10,<br><br>Defendants. | Civil Case No.: 1:18-cv-04921-JGK |

**OPPOSITION TO DEFENDANT PARKER PETIT'S MOTION TO DISMISS**
**PLAINTIFF'S COMPLAINT FOR LACK OF PERSONAL JURISDICTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD......................................................................................................... 3

BACKGROUND ................................................................................................................ 4

    A.  Petit was, for all intents and purposes, the face of MiMedx and regularly had a
presence in New York............................................................................................ 4

    B.  While CEO and Chairman, Petit boasted about his business in New York and the
importance of MiMedx being listed with the NASDAQ, a New York company............... 4

    C.  In September 2017, reports began circulating about MiMedx's fraudulent accounting
practices. .............................................................................................................. 5

    D.  So, MiMedx files a lawsuit against Sparrow, falsely accusing it of being "Aurelius
Value" and spreading lies about MiMedx in order to depress its stock............................ 6

    E.  Petit, in turn, begins advertising his and MiMedx's efforts to supposedly bring
Sparrow to justice, claiming that the parties it sued are "criminals" engaging in illegal
securities fraud and market manipulation. ......................................................... 6

    F.  But by June 2018, it becomes clear the rumors about MiMedx had truth: the
Department of Justice unseals bribery indictments implicating MiMedx; MiMedx is
forced to announce that its past six years of financial statements and press releases
must be retracted and cannot be relied upon; and Pete Petit resigns. ................. 6

    G.  New York prosecutors are investigating MiMedx (and therefore also Petit). .................. 7

ARGUMENT ..................................................................................................................... 8

    A.  Personal Jurisdiction Over Petit is Appropriate Under C.P.L.R. § 302(a)(1)..................... 8

    B.  In the alternative, Sparrow has presented sufficient factual allegations to justify
jurisdictional discovery. ..................................................................................... 14

CONCLUSION.................................................................................................................. 15

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.I. Trade Fin., Inc. v. Petra Bank*,
   989 F.2d 76 (2d Cir. 1993)...................................................................................... 3

*Best Van Lines, Inc. v. Walker*,
   490 F.3d 239 (2d Cir. 2007)................................................................................. 8, 9

*Biro v. Condé Nast*,
   2012 U.S. Dist. LEXIS 113188 (S.D.N.Y. Aug. 10, 2012) ....................... 2, 8, 9, 13

*City of Almaty v. Ablyazov*,
   278 F. Supp. 3d 776 (S.D.N.Y. 2017)...................................................................... 14

*Fischer v. Stiglitz*,
   No. 15-CV-6266 (AJN), 2016 U.S. Dist. LEXIS 74842 (S.D.N.Y. June 8, 2016) ............... 14

*GTP Leisure Prods., Inc. v. B-W Footwear Co.*,
   391 N.Y.S.2d 489 (App. Div. 1977)............................................................... 9, 10, 12

*Legros v. Irving*,
   327 N.Y.S.2d 371 (App. Div. 1971)..................................................................... 9, 10

*S. New Eng. Tel. Co. v. Global NAPs Inc.*,
   624 F.3d 123 (2d Cir. 2010)....................................................................................... 3

*Sovik v. Healing Network*,
   665 N.Y.S.2d 997 (4th Dep't 1997)........................................................................... 9

*Tannerite Sports, LLC v. Nbcuniversal Media, LLC*,
   135 F. Supp. 3d 219 (S.D.N.Y. 2015)........................................................................ 9

*Togut v. Forever 21, Inc.*,
   285 F. Supp. 3d 643 (S.D.N.Y. 2018)...................................................................... 15

*Whitaker v. American Telecasting, Inc.*,
   261 F.3d 196 (2d Cir. 2001)....................................................................................... 3

**Statutes**

N.Y. C.P.L.R. § 302................................................................................................... 8

**Federal Rules**

Fed. R. Civ. P. 12(b)(2)............................................................................................ 3

Fed. R. Civ. P. 12(b)(6)...................................................................................... 2, 10

# INTRODUCTION

After reports surfaced accusing Defendant Parker "Pete" Petit of accounting fraud and other improprieties in his capacity as CEO and Chairman of MiMedx Group, Inc., Petit caused MiMedx to file a lawsuit in this Court accusing Plaintiff Sparrow Fund Management, LP, of being the source of those supposedly "fraudulent" reports (the "MiMedx Lawsuit").[1] Sparrow is not and never was the source or author of any of those reports and immediately informed MiMedx of that fact. But Petit and MiMedx have persisted in their course of action, creating a media parade of press releases, website commentary, and shareholder communications advertising their efforts to supposedly bring to justice Sparrow, the alleged architect of an effort to bring MiMedx stock down in order to profit from a short position in it. But now, as more evidence has come to light, it appears those original reports that Petit so feverishly claimed were fraudulent were not off the mark. Indeed, in the months following the filing of the MiMedx Lawsuit, MiMedx has been implicated in a bribery scandal; MiMedx has announced it is under investigation by the Department of Justice and Securities and Exchange Commission; MiMedx was forced to retract nearly six years' worth of financial statements and press releases; and Petit resigned from the company due in part to the ongoing investigation into the accusations. And so, the record creates plausible inferences as to Petit's motivations in causing the MiMedx Lawsuit: distract the investing public from MiMedx's internal problems in the form of a convenient scapegoat; prevent delisting from the Nasdaq (the importance of which Petit had previously stressed in the press); and avoid criminal and/or civil prosecution in New York. Sparrow is a relatively young investment firm whose professional reputation and integrity is its primary asset, and it is completely innocent of the charges Defendants have levied against it. And so, it has

---

[1] *See* Complaint for Damages and Injunctive Relief, MiMedx v. Sparrow, No. 1:17-cv-07568-PGG-KHP (S.D.N.Y. Oct. 4, 2017), ECF No. 1.

brought claims against MiMedx and Petit for defamation, arguing that the MiMedx Lawsuit itself was a sham (thus not subject to any privilege) and, in any event, that Defendants' out-of-court statements grossly exceeded and misrepresented what was claimed in the litigation.

Now, however, Petit asks the Court to dismiss the claims against him for lack of personal jurisdiction because he is a non-resident of New York. But New York courts may exercise personal jurisdiction over a non-resident in a defamation claim "where the defendant engaged in some purposeful activity within New York that was directly related to the creation of the allegedly defamatory work." *Biro v. Condé Nast*, 2012 U.S. Dist. LEXIS 113188, at *29 (S.D.N.Y. Aug. 10, 2012). And here, Sparrow has alleged – and the cognizable evidence and record demonstrate – that Petit transacted significant business within New York purposefully aimed at defaming Sparrow. First, Petit caused the filing of a lawsuit in New York that Sparrow has alleged was a sham lawsuit designed entirely to defame Sparrow and distract the investing public.[2] Second, Petit made at least some (if not all) of the defamatory statements while physically in New York. Third, Petit directed his efforts in defaming Sparrow not only at the investing public but also at the Nasdaq stock market, where MiMedx is currently listed. Petit has previously spoken of the importance of MiMedx being listed on the Nasdaq, and he had every motivation to avoid delisting should MiMedx's accounting practices come to light. Thus, it is not a stretch to infer he initiated the MiMedx Lawsuit to disguise and distract from those underlying issues. And finally, MiMedx is now under criminal investigation in New York. At all relevant times, Petit was both the CEO and Chairman of the Board of MiMedx, and since MiMedx is under investigation (in New York), Petit almost certainly is as well. It is inconceivable that Petit

---

[2] In its Opposition to Defendants Motion to Dismiss under FRCP 12(b)(6) (ECF. No. 45), Sparrow outlines in greater detail the basis of its allegation that the MiMedx Lawsuit was a sham lawsuit, and Sparrow respectfully refers the Court to that filing, filed concurrently herewith.

is not regularly engaged with New York law enforcement authorities since the entire purpose of initiating the MiMedx Lawsuit was to avoid prosecution (in New York), avoid Nasdaq delisting (in New York), deceive the investing public (headquartered in New York) and defame Sparrow (which was previously located in New York).

Sparrow has more than pleaded plausible facts creating a prima facie case for personal jurisdiction over Petit. And Sparrow respectfully requests the Court deny Petit's motion. In the alternative, Sparrow respectfully requests the Court allow limited jurisdictional discovery to unearth those facts related to the issues in this matter which would almost certainly reveal the full extent of Petit's transactions within New York.

## <u>LEGAL STANDARD</u>

On motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), Plaintiff "bears the burden of establishing that the court has jurisdiction over the defendant," but at the pleading stage, Plaintiff is required only to make a prima facie showing of jurisdiction over the defendant. *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (internal citations omitted). "This showing may be made through the plaintiff's 'own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant.'" *S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) (quoting *Whitaker*, 261 F.3d at 208). All pleadings and affidavits are "construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiffs' favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993).

3

## BACKGROUND

**A.     Petit was, for all intents and purposes, the face of MiMedx and regularly had a presence in New York.**

At all relevant times until approximately July 2, 2018, Petit was the CEO and Chairman of the Board of Directors of MiMedx.[3] Petit is also a substantial shareholder of MiMedx stock.[4] Though Petit is a resident of Georgia, he conducts significant business activities within New York. He is CEO of a different New York company (a fact not denied in his motion to dismiss) and "travels there frequently to conduct business and avail himself of the privilege of conducting business in New York."[5] Further, as former CEO and Chairman of MiMedx, he regularly met and "conduct[ed] shareholder business in New York."[6]

**B.     While CEO and Chairman, Petit boasted about his business in New York and the importance of MiMedx being listed with the NASDAQ, a New York company.**

The Nasdaq stock market is a well-known American stock exchange, owned and operated by Nasdaq, Inc.[7] The Nasdaq, as it is most commonly known, is a Delaware company located in New York.[8] Trading on the Nasdaq, of course, takes place in New York.

On his personal website, Petit spoke of the importance of MiMedx being listed on the Nasdaq. He even posted on this website a picture of himself ringing the opening bell for the NASDAQ on July 12, 2013. Coupled with that picture, he was quoted as having said:

---

[3] MiMedx Group, Inc., Current Report (Form 8-K) (June 30, 2018), https://www.sec.gov/Archives/edgar/data/1376339/000119312518210478/d655278d8k.htm.
[4] MiMedx Group, Inc., Schedule 13D/A (December 31, 2017), https://www.sec.gov/Archives/edgar/data/901434/000162828018001144/petitsch13da2017.htm.
[5] Complaint for Defamation Per Se and Civil Conspiracy at ¶ 6. Sparrow v. MiMedx, No. 1:18-cv-04921-PGG-KHP (S.D.N.Y. June 4, 2018), ECF No. 1 (hereinafter, "Complaint").
[6] Complaint ¶ 6.
[7] NYS Department of State, Divisions Corporation, Entity Information, https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_SEARCH_ENTRY (search "Nasdaq, Inc."; then follow "Nasdaq, Inc." hyperlink) (last visited Sept. 13, 2018).
[8] *Id.*

> Our listing on NASDAQ represents another significant milestone
> in our strategy to broaden our exposure to the investment
> community and to increase the trading volume in our stock.[9]

The Nasdaq requires companies listing with it to meet certain reporting requirements and failure to keep current on the various disclosure requirements can result in a company being delisted from the Nasdaq. As explained more below, in connection with MiMedx's retraction of nearly six years' worth of financial statements and press releases, MiMedx was forced to disclose that the company would "be delisted unless [MiMedx] requests a hearing before a Nasdaq Listing Qualifications Panel by July 27, 2018."[10]

## C. In September 2017, reports began circulating about MiMedx's fraudulent accounting practices.

In September 2017, two anonymous bloggers and a former employee of MiMedx began publicizing accusations of accounting fraud within MiMedx.[11] One of the bloggers goes by the handle "Aurelius Value."

Whether related to these reports or for some other reason, MiMedx has historically "been heavily 'shorted' by investors," which means "to 'borrow' the stock from a lender with an agreement to return the stock at a later date," after which "[t]he borrower then sells the stock at a high price, banking on the stock dropping in value."[12] "Once the stock drops in value, the borrower then purchases the stock at the lower price and returns it to lender, thereby making a profit on the transaction."[13]

---

[9] *MiMedx Group, Inc. Rings NASDAQ Opening Bell*, PETE PETIT OFFICIAL WEBSITE, http://www.petepetit.com/pete-petit-professional-blog/2013/mimedx-group-inc-rings-nasdaq-opening-bell.html (last visited Sept. 13, 2018).

[10] MiMedx Group, Inc., Current Report (Form 8-K) (July 26, 2018), https://www.sec.gov/Archives/edgar/data/1376339/000119312518227970/d553594d8k.htm.

[11] Complaint ¶¶ 10-11.

[12] Complaint ¶ 9.

[13] *Id.*

**D.**     **So, MiMedx files a lawsuit against Sparrow, falsely accusing it of being "Aurelius Value" and spreading lies about MiMedx in order to depress its stock.**

In October 2017, MiMedx filed a lawsuit against Sparrow in the Southern District of New York, Case No. 1:17-cv-07568-PGG-KHP,[14] alleging that Sparrow was and is Aurelius Value and that Sparrow, as Aurelius Value, was purposefully seeking to depress stock in order to profit from a short position in MiMedx stock. Neither Sparrow, nor any of its three employees, is or ever was or ever directed any agents to be or act as Aurelius Value.[15]

**E.**     **Petit, in turn, begins advertising his and MiMedx's efforts to supposedly bring Sparrow to justice, claiming that the parties it sued are "criminals" engaging in illegal securities fraud and market manipulation.**

In press releases, shareholder communications, and numerous other public correspondences, Petit repeated the accusations against Sparrow. The Complaint outlines those in detail and they need not be repeated here, except to note that Petit himself made many of the statements at issue[16] and that he made at least some of his statements while physically in New York.[17] It is possible he made all of the statements in New York, though outside of jurisdictional discovery, Sparrow is unable to confirm that fact.

**F.**     **But by June 2018, it becomes clear the rumors about MiMedx had truth: the Department of Justice unseals bribery indictments implicating MiMedx; MiMedx is forced to announce that its past six years of financial statements and press releases must be retracted and cannot be relied upon; and Pete Petit resigns.**

While Defendants were conducting their public campaign against Sparrow, the truth behind Defendants' business practices began to emerge. And it revealed Defendants' business practices were apparently not as sound as they claimed.

---

[14] Again, this case is referred to herein as the MiMedx Lawsuit.
[15] Complaint ¶ 12.
[16] Complaint ¶¶ 12-27.
[17] Complaint ¶ 23.

On May 8, 2018, the federal district court of the District of South Carolina unsealed indictments accusing certain VA hospital employees of accepting bribes from MiMedx employees.[18]

On June 6, 2018, MiMedx issued a Form 8-K with the SEC, stating that "[MiMedx's] consolidated financial statements and other financial information, any press releases, investor presentations or other communications related thereto [from each fiscal year dating back to December 31, 2012] should no longer be relied upon," and that MiMedx's Audit Committee was "conducting an independent investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at [MiMedx] and certain other matters."[19]

And on July 2, 2018, MiMedx announced Pete Petit's resignation as CEO and Chairman, "based on the Board of Directors' business judgment regarding [MiMedx's] leadership and direction, and arise, in part, from the information the Audit Committee has identified through its previously announced independent investigation [which investigation related to allegations regarding sales and distribution practices at MiMedx]."[20]

## G.   New York prosecutors are investigating MiMedx (and therefore also Petit).

On February 26, 2018, it was reported that "[t]he SEC's enforcement division is looking into [MiMedx's] practices related to distributors, and the agency's Denver office has been working with federal prosecutors in Manhattan."[21] In a press release dated March 15, 2018,

---

[18] Complaint ¶¶ 40-42.
[19] MiMedx Group, Inc., Current Report (Form 8-K) (June 6, 2018), https://www.sec.gov/Archives/edgar/data/1376339/000137633918000036/a8-kdocument662018.htm.
[20] MiMedx Group, Inc., Current Report (Form 8-K) (June 30, 2018), https://www.sec.gov/Archives/edgar/data/1376339/000119312518210478/d655278d8k.htm.
[21] Anders Melin and Greg Farrell, *U.S. Probes MiMedx's Federal Contracts, Accounting*, BLOOMBERG (Feb. 26, 2018, 7:16 AM), https://www.bloomberg.com/news/articles/2018-02-26/u-s-is-said-to-probe-mimedx-s-federal-contracts-accounting.

MiMedx confirmed the SEC and DOJ were both reviewing MiMedx's accounting and sales practices.[22] As CEO and Chairman during the relevant time periods, Petit was, for all practical purposes, the operational head of MiMedx. And thus, the various agencies' investigations into MiMedx quite certainly included investigations into Petit's own conduct, as even MiMedx's own disclosure suggests.

## ARGUMENT

### A.    Personal Jurisdiction Over Petit is Appropriate Under C.P.L.R. § 302(a)(1)

New York's Long Arm Statute, N.Y. C.P.L.R. § 302, governs personal jurisdiction over a non-domiciliary who either "transacts any business" or "commits a tortious act" within the state. Only Section 302(a)(1) is at issue here, because the statute expressly excludes from the other two sections (a)(2) and (a)(3) defamation claims. Under 302(a)(1), "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent" "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). Determining whether there is specific jurisdiction under Section 302(a)(1) is a two-step process. Courts must decide: (1) whether the defendant "transacts any business" in New York; and (2) whether the cause of action arises from such business transactions. *Biro*, 2012 U.S. Dist. LEXIS 113188, at *25-26.

When it comes to defamation claims, the two prongs fold into one, because in New York the mere "act of uttering the defamation itself" does not qualify as "transacting any business." *Biro*, 2012 U.S. Dist. LEXIS 113188, at *26 (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 248 (2d Cir. 2007)). Rather, the Court must examine the "transacting any business" prong in light of the second prong and determine whether the "purposeful business transactions [that]

---

[22] MiMedx Group, Inc., Press Release (Exhibit 99.1 to Form 8-K) (Mar. 31, 2018), https://www.sec.gov/Archives/edgar/data/1376339/000137633918000026/0001376339-18-000026-index.html.

have taken place in New York giv[e] rise to the cause of action." *Legros v. Irving*, 327 N.Y.S.2d 371, 373 (App. Div. 1971). "A suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Biro*, 2012 U.S. Dist. LEXIS 113188, at *26 (quoting *Best Van Lines*, 490 F.3d at 248). And in a defamation claim, the transaction of business must be "substantially related to the defamation claim in order to form the basis of long-arm jurisdiction." *Id.* at 28. "Courts have typically found long-arm jurisdiction over defamation claims where the defendant engaged in some purposeful activity within New York that was directly related to the creation of the allegedly defamatory work." *Id.* at 29. Or, as this court previously put it, jurisdiction over a defamation claim is appropriate where: "(1) the defamatory utterance was purposefully directed at New York, as opposed to reaching New York fortuitously; and (2) the defendant transacted other business in New York that was directly connected to the claim asserted." *Tannerite Sports, LLC v. Nbcuniversal Media, LLC*, 135 F. Supp. 3d 219, 230 (S.D.N.Y. 2015) (citation omitted). *See, e.g., Legros,* 327 N.Y.S.2d at 373 (determining jurisdiction over the out-of-state defendant was proper because all of the work associated with publication of the defamatory statement occurred in New York); *GTP Leisure Prods., Inc. v. B-W Footwear Co.*, 391 N.Y.S.2d 489, 490-91 (App. Div. 1977) (holding that jurisdiction over a non-domiciliary defendant was appropriate where the subject of the defamatory statements was a New York transaction); *Sovik v. Healing Network*, 665 N.Y.S.2d 997, 999 (4th Dep't 1997) (holding that where defendants drafted and either distributed or authorized distribution of allegedly defamatory letter in Buffalo, New York, there was sufficient basis for long-arm jurisdiction).

Further, so long as the non-domiciliary (Petit) "engages in a purposeful business transaction in New York and makes a defamatory statement *outside* of New York about that specific transaction, New York courts may exercise jurisdiction over his person for a cause of action based upon the defamatory statement." *GTP Leisure*, 391 N.Y.S.2d at 490 (emphasis added); *see also Legros*, 327 N.Y.S.2d at 373-74 (rejecting an argument that jurisdiction must be "grounded upon either the final act or the ultimate act causing the injury," because "[i]t is sufficient if the cause of action is related to and grows out of the transaction business in New York.").

Here, Petit's entire course of action over the last year – as outlined in the allegations and cognizable record – constitutes "purposeful activity within New York that was directly related to the creation of the allegedly defamatory work." And to the extent Petit's defamatory statements occurred outside of New York, they were aimed at Petit's New York transactions.

First, Petit, as CEO of MiMedx, caused the filing of the MiMedx Lawsuit in New York, which as outlined previously, and as detailed in the Complaint and in Sparrow's concurrent opposition to Defendants' Motion to Dismiss under FRCP 12(b)(6), was a sham lawsuit designed to distract the investing public's attention away from MiMedx's and Petit's own potential civil and criminal exposure. Thus, the filing of the MiMedx Lawsuit itself was a purposeful business transaction in New York directly related to the creation and subsequent publication of Petit's defamatory statements.

Second, in fact, since filing its sham lawsuit, in his motion to dismiss the Complaint for failure to state a claim, Petit has moved the Court to dismiss the defamation complaint under Section 74 of the NY Civil Rights Law, claiming that the MiMedx Lawsuit protects his defamatory statements from defamation claims. In other words, Petit not only caused the filing of

a lawsuit in a New York, he now also claims protection from any defamation lawsuit under New York's civil rights laws, all while now arguing he has not conducted business in the state or otherwise availed himself of New York sufficient for New York courts to have jurisdiction on him. He cannot have it both ways.

Third, Petit has personally spoken of the importance of MiMedx being listed on the Nasdaq, a well-known company based in and associated with New York. He even posted on his personal website a picture of himself in New York City ringing the opening bell for the NASDAQ on July 12, 2013. Coupled with that picture, he was quoted as having said:

> Our listing on NASDAQ represents another significant milestone in our strategy to broaden our exposure to the investment community and to increase the trading volume in our stock.[23]

Failure to adhere to certain accounting requirements and reporting requirements as required by federal and state securities laws may result in a company being delisted from the Nasdaq. The public record is now clear that MiMedx has been implicated in a bribery scandal; is under investigation by Manhattan prosecutors; was forced to retract nearly six years' worth of financial statements and press releases; and that Petit himself had to resign due to his involvement in the allegations of accounting fraud at MiMedx. On July 26, 2018, MiMedx issued an 8-K disclosing that the Nasdaq had already threatened to delist MiMedx unless it requested a hearing before the Nasdaq Listing Qualifications Panel.[24] And so, when bloggers began publicizing accounts of accounting fraud at MiMedx, Petit had every incentive to distract the investing public from what were clearly colorable, if not outright accurate, allegations of

---

[23] *MiMedx Group, Inc. Rings NASDAQ Opening Bell*, PETE PETIT OFFICIAL WEBSITE, http://www.petepetit.com/pete-petit-professional-blog/2013/mimedx-group-inc-rings-nasdaq-opening-bell.html (last visited Sept. 13, 2018).

[24] MiMedx Group, Inc., Current Report (Form 8-K) (July 26, 2018), https://www.sec.gov/Archives/edgar/data/1376339/000119312518227970/d553594d8k.htm.

overstated revenue and accounting fraud at MiMedx.[25] Petit, therefore, caused MiMedx to file a

sham lawsuit (in New York) to distract the investing public from his own legal and regulatory

jeopardy. More importantly for purposes of the jurisdictional analysis, Petit caused that lawsuit

to be filed in New York, which he followed with a media blitz, quoting the lawsuit and making

defamatory statements to discredit and attack Sparrow. Petit's statements, some of which were

physically made in New York, were directed at the Nasdaq (a New York institution) in an effort

to prevent delisting.

      Third, MiMedx is under investigation by Manhattan prosecutors; MiMedx was forced to

retract nearly six years' worth of financial statements and press releases; and Petit resigned from

the company "based on the Board of Directors' business judgment regarding [MiMedx's]

leadership and direction, and arise, in part, from the information the Audit Committee has

identified through its previously announced independent investigation [which investigation

related to allegations regarding sales and distribution practices at MiMedx]."[26] Thus, it does not

require much of a stretch to conclude that Petit is also under criminal investigation and/or

working with authorities in New York to avoid prosecution.

      Fourth, Petit made defamatory statements both online *and* while physically present in

New York. And so long as his statements outside of New York referenced his transactions within

New York (i.e., the filing of the MiMedx Lawsuit, the shareholder communications, the

interactions with Nasdaq, etc.), they weigh in favor of jurisdiction. *GTP Leisure*, 391 N.Y.S.2d at

490. On November 30, 2017, Petit, in a public conference appearance with the investment

---

[25] Aside from wanting to avoid delisting from the NASDAQ, Petit was also CEO and is a significant shareholder of MiMedx. MiMedx Group, Inc., Schedule 13D/A (December 31, 2017), https://www.sec.gov/Archives/edgar/data/901434/000162828018001144/petitsch13da2017.htm. Thus, he had significant financial incentive as well to suppress investor concern over reports of MiMedx's fraudulent practices.

[26] MiMedx Group, Inc., Current Report (Form 8-K) (June 30, 2018), https://www.sec.gov/Archives/edgar/data/1376339/000119312518210478/d655278d8k.htm.

community that physically took place in New York, referred to the "short sellers" as being engaged in "illegal" behavior. He specifically identified those entities he accused of "illegal" behavior as the ones that MiMedx was going "down the civil path with," which included Sparrow. His statements were recorded and subsequently published to investors.[27] Further, on November 30, 2017, Petit wrote a letter to the SEC, which MiMedx subsequently posted to the "short selling commentary" section of its website, describing Aurelius Value, the Twitter handle he accused Sparrow of using, as a "shill" engaged in "recent illegal short selling."[28] And again, on January 18, 2018, Petit referred in a conference call with the investment community to the short sellers "using illegal techniques." His statements were recorded and subsequently published to investors.[29] Indeed, many of the defamatory public statements he made were transcribed by Bloomberg Inc. a New York company.[30] Again, it is unclear whether all of these other statements were made while physically in New York in the absence of limited jurisdictional discovery.

In summary, the pleadings and record are replete with instances of Petit "engag[ing] in some purposeful activity within New York that was directly related to the creation of the allegedly defamatory work." *Biro*, 2012 U.S. Dist. LEXIS 113188, at *29. All of Petit's defamatory statements were intended to promote MiMedx's stock price and maintain its listing on the Nasdaq, a New York based company. While the defense wants this Court to believe Petit's statements were made in passing, in reality, as head of a Nasdaq-listed entity, every one of his statements was transcribed and recorded for dissemination to the investment community

---

[27] Complaint ¶ 23.
[28] Complaint ¶ 24.
[29] Complaint ¶ 25.
[30] Bloomberg Inc. is a Delaware company headquartered in New York. NYS Department of State, Divisions Corporation, Entity Information, https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_SEARCH_ENTRY (search "Bloomberg Inc."; then follow "Bloomberg Inc." hyperlink) (last visited Sept. 13, 2018).

that is centered around New York. The totality of circumstances evidences the direct and targeted nature of Petit's defamatory statements as to the New York market and investors. Consequently, exercise of personal jurisdiction over him is warranted and this Court should deny Defendants' motion to dismiss.

Petit argues that his activities within New York must have been undertaken with the specific intent to generate his defamatory statements. As explained below, that is an incomplete characterization of the case law. But even so, Sparrow has pleaded, and the record demonstrates that Petit *did* go to New York and conduct his various transactions there with the specific intent to defame Sparrow – i.e., filing the MiMedx Lawsuit, meeting with investors, courting the Nasdaq, etc. In either event, Defendants misstate the law. In *Fischer v. Stiglitz*, the case upon which Defendants rely for their proposition, the court noted that New York courts have "suggest[ed] that more 'substantial' ties to New York might lessen the required showing that New York activities were initiated 'in order to' engage in the allegedly defamatory activity." No. 15-CV-6266 (AJN), 2016 U.S. Dist. LEXIS 74842, at *19 (S.D.N.Y. June 8, 2016). Here, Petit's ties to New York are quite substantial, as previously noted and thus the *Fischer* rule is inapplicable.

**B.     In the alternative, Sparrow has presented sufficient factual allegations to justify jurisdictional discovery.**

A plaintiff who fails to establish a prima facie case of personal jurisdiction may request a period of limited discovery for the purpose of obtaining further jurisdictional evidence. "Jurisdictional discovery is warranted where, even if plaintiff has 'not made a prima facie showing, they have made a sufficient start toward establishing personal jurisdiction.' A court should 'take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction. . . .'" *City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 809

(S.D.N.Y. 2017) (citations omitted). "A court generally should allow a plaintiff 'an opportunity to conduct discovery on ... jurisdictional facts, at least where the facts, for which discovery is sought, are peculiarly within the knowledge of the opposing party.'" *Togut v. Forever 21, Inc.*, 285 F. Supp. 3d 643, 648 (S.D.N.Y. 2018) (citations omitted).

It is inconceivable that Petit, who directed the filing of a lawsuit in New York, held shareholder conferences in New York to boast about MiMedx's efforts to combat the "criminal" short sellers, and who helmed a company now under investigation by Manhattan prosecutors, the SEC, and the DOJ, would not have regular and consistent transactions throughout the state related to his efforts to defame Sparrow in order to maintain the Nasdaq listing, avoid criminal prosecution, and bolster MiMedx stock. Thus, even if the Court finds it lacks personal jurisdiction over Petit based on the current body of evidence, Sparrow respectfully requests the Court order limited jurisdictional discovery to achieve certainty.

## CONCLUSION

It is difficult to imagine what more purposeful activity Petit could have engaged in within New York than the filing of a sham lawsuit in a New York that he then converted into a media parade to distract public attention from issues that would threaten MiMedx's Nasdaq listing, his status as CEO, and his personal holdings in the company, as well as perhaps even expose him to criminal liability.

Sparrow respectfully requests the Court deny Petit's motion to dismiss for lack of personal jurisdiction. Or, in the alternative, Sparrow request the Court allow it limited jurisdictional discovery into the extent of Petit's contacts and transactions within New York, particularly as it relates to the facts underlying the Complaint and their connection with New York.

Dated: September 14, 2018

Respectfully submitted,

**BRESSLER, AMERY & ROSS, P.C.**

/s/ Nikolas S. Komyati
Nikolas S. Komyati, NYB #4298188
nkomyati@bressler.com
Bressler, Amery & Ross, P.C.
17 State Street
New York, NY 10004
Tel: 212-425-9300
Fax: 212-425-9337

**HARRIS BERNE CHRISTENSEN LLP**

/s/ Adam S. Heder
Adam S. Heder, CSB #270946, OSB #151144
adamh@hbclawyers.com
Harris Berne Christensen LLP
5000 Meadows Road, Suite 400
Lake Oswego, OR 97035
Tel: 503-968-1475
Fax: 503-968-2003
*Admitted pro hac vice*

*Counsel for Plaintiff Sparrow Fund
Management, LP*