**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SPARROW FUND MANAGEMENT, LP,<br><br>Plaintiff,<br><br>v.<br><br>MIMEDX GROUP, INC.,<br><br>Defendant. | Civil Case No.: 1:18-cv-04921-PGG-KHP<br><br>**FIRST AMENDED COMPLAINT FOR DEFAMATION PER SE AND MALICIOUS PROSECUTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Sparrow Fund Management LP ("Sparrow"), brings this action against Defendant MiMedx Group, Inc. ("MiMedx"). In 2017, an anonymous blogger, Aurelius Value, published numerous detailed allegations of widespread accounting fraud at MiMedx, a public company traded on the NASDAQ stock exchange. Subsequent investigations, reports, and public filings have confirmed the reports were well-founded. Desperate to stop the flow of negative information about it, MiMedx promised its shareholders to bring the blogger to justice, falsely claiming s/he was spreading lies about MiMedx. MiMedx filed a lawsuit against Sparrow in October 2017[1], the "MiMedx Lawsuit," in which it accused Sparrow of being Aurelius and engaging in illegal market manipulation. Sparrow is not, was not, and never has been, Aurelius. Nor has Sparrow ever directed anyone to post as Aurelius. Sparrow has nothing to do with Aurelius. MiMedx had no probable cause for accusing Sparrow of being Aurelius or engaging in market manipulation, and in fact knew full well Sparrow is *not* Aurelius. Yet Defendant proceeded with its claims nonetheless because it believed it could coerce the identity of Aurelius from Sparrow through defamation and malicious prosecution. Defendant followed its lawsuit with a six-month campaign to defame and destroy Sparrow as a means to this end. Sadly, its efforts were successful. MiMedx

---

[1] *MiMedx Group, Inc., et al. v. Sparrow Fund Management, LP, et al.*, 1:17-cv-07568-PGG-KHP (S.D.N.Y. 2017).

tainted Sparrow with its false allegations of illegal market manipulation and Sparrow was, as a result, forced out of business in 2018. Defendant's scheme to injure Sparrow literally destroyed the business.

Sparrow brings this lawsuit now to seek damages for Defendant's false, malicious, and tortious campaign to destroy it.

## JURISDICTION

1.     Plaintiff Sparrow is a Delaware limited partnership with its principal place of business in California and New York. At all times relevant to the allegations herein, Sparrow was conducting its business primarily out of New York. Sparrow's principals live in California, though at times relevant herein, a majority of its principals lived in New York.  Sparrow is in the investment management business, investing and growing capital on behalf of its investors.

2.     Defendant MiMedx is a Florida corporation with its principal place of business in Georgia. At all relevant times, MiMedx was publicly traded on the NASDAQ exchange under the ticker symbol "MDXG." MiMedx describes itself as "a leading biopharmaceutical company developing and marketing regenerative and therapeutic biologics utilizing human placental tissue allografts with patent-protected processes for multiple sectors of healthcare."

3.     This Court has both general and specific personal jurisdiction over Defendant MiMedx. New York's long-arm statute confers personal jurisdiction on non-residents where those non-residents "transact[] any business within the state or contract[] anywhere to supply goods or services in the state." MiMedx conducts extensive business throughout New York, and a significant component of its sales network is located in the state. It has employees physically located throughout the state. At all relevant times, its shares were traded on the NASDAQ, physically located in New York. And it regularly conducts management and investor meetings in New York. As to the allegations herein, MiMedx brought suit against Sparrow in the federal

2

district court for the Southern District of New York and has thus availed itself of New York's courts. In connection with its court action, MiMedx accused Sparrow of "illegal" behavior. It has repeated such claims in numerous platforms both within and without New York. Further, MiMedx turned its civil action against Sparrow, physically taking place in New York, into a media parade of false and defamatory statements against Sparrow.

4.      The Court also has subject matter jurisdiction over this case because there is diversity of citizenship among the parties, and the amount in controversy, exclusive of costs and interests, exceeds $75,000.00. Accordingly, pursuant to 28 U.S.C. § 1332, the Court has subject matter jurisdiction over this case.

5.      Venue is also proper in this case because, pursuant to 28 U.S.C. § 1391, this venue is where "a substantial part of the events or omissions giving rise to the claim occurred" and because this Court has personal jurisdiction over Defendant.

**MIMEDX APPEARED TO BE THRIVING UNTIL NUMEROUS WHISTLEBLOWERS BEGAN REPORTING ABOUT ILLEGAL BUSINESS PRACTICES**

6.      MiMedx was once a high-flying billion-dollar company with, according to some reports, the largest share of the wound-healing market in the US. But starting around December 2016, numerous former employees of MiMedx, including Mike Fox, Jess Kruchoski, and Luke Tornquist, made public allegations stating that MiMedx was "channel stuffing" through distributors to hospitals belonging to the Department of Veterans Affairs. Following these allegations, the Securities & Exchange Commission ("SEC") opened a formal investigation into MiMedx's accounting practices in February 2017. Initially, MiMedx did not disclose the existence of this investigation.

7.      In September 2017, two anonymous bloggers, Aurelius Value ("Aurelius") and Viceroy Research ("Viceroy"), began tweeting and publicly posting content claiming MiMedx's

stock was inflated because the company was "channel stuffing," a fraudulent practice described as a company shifting inventory between sales channels to make it appear that the inventory has been sold when it actually has not, thereby overstating reported revenues. The anonymous bloggers also claimed that MiMedx was engaged in illegal kickback payments to doctors.

8.      Through September 2017, MiMedx had gone out of its way to keep the SEC investigation a secret from the public. But in response to details included in the Aurelius blog post, MiMedx was forced to publicly admit on September 21, 2017 that the SEC was investigating its revenue recognition practices.

9.      Despite this admission, MiMedx continued to publicly deny that there was any ongoing fraud, touting the results of an Audit Committee investigation from months earlier that allegedly cleared the company of any wrongdoing in relation to accounting fraud claims made by former employees.

10.      After the company finally admitted to the ongoing SEC investigation, its stock began to slide. Furthermore, journalists and anonymous bloggers who were publishing articles about MiMedx were rapidly uncovering new evidence that corroborated allegations of rampant fraud at MiMedx.

11.      As detailed below, the public now knows that the reports about MiMedx's accounting and business practices were well founded.

### BUT RATHER THAN REMEDY OR ADMIT TO ITS IMPROPER PRACTICES, MIMEDX BEGAN A CAMPAIGN TO TARGET ANYONE DARING TO REPORT ABOUT IT

12.      In a desperate attempt to stop the flow of negative information about its business practices into the marketplace and to divert attention away from its improper activities, MiMedx began to target its critics. The company's first overt action against non-employee critics came on September 20, 2017 when MiMedx filed a lawsuit against The Capitol Forum, a regulatory

4

consulting firm in Washington D.C. This was the first of a series of lawsuits that MiMedx filed against company critics.

13.     But that did not stop the cascading of negative news about MiMedx. On September 27, 2017, Aurelius published a second blog post about MiMedx. The blog post exposed that the Audit Committee's prior investigation into wrongdoing was conflicted and run by a fraternity brother of MiMedx's former CEO (and CEO at all times relevant herein), Parker H. "Pete" Petit. The blog post also alleged the law firm that conducted the investigation was conflicted, having held a multi-year relationship with Petit. MiMedx had been relying on the Audit Committee's prior whitewashed investigation in its communications with the SEC.

14.     On September 29, 2017, MiMedx posted an article on its website entitled "MiMedx Exposes False, Misleading and Fabricated Allegations by Short Sellers." In the article, MiMedx admitted that it did not know who was behind the Aurelius blog posts and bemoaned the difficulty of unmasking Aurelius, admitting that it was "extremely difficult to locate any of [Aurelius'] principals." In the article, MiMedx expressly promised its shareholders that it would find the individual behind the Aurelius blog post and hold him/her accountable through legal action.

15.     That promise would eventually become MiMedx's next overt action against its critics, i.e., the MiMedx Lawsuit.

16.     But, of course, MiMedx still had no idea who Aurelius was.

### ENTER AXOS – A FIRM THAT HAD SPENT THE PAST 18 MONTHS UNSUCCESSFULLY ATTEMPTING TO UNMASK AURELIUS

17.     MiMedx had promised to bring Aurelius to justice and was under pressure to do so quickly to stem the flow of negative information about it. A simple online search at the time would have revealed a different company's efforts over the prior year to do that exact same thing. That

company was Axos Financial ("Axos," previously known as BofI Federal Bank), and MiMedx soon became familiar with its history.

18.    Aurelius began publishing research about public companies in October 2015. Aurelius publishes reports on a website called Seeking Alpha (www.seekingalpha.com) as well as on his/her own website (www.aureliusvalue.com). Seeking Alpha is a crowd-sourced content service for financial markets.

19.    Aurelius published numerous articles critical of Axos. In total, Aurelius published over 10 articles about Axos.

20.    Axos, unhappy with Aurelius' coverage of its company, was eager to learn the identity of Aurelius and utilized discovery tools as part of a whistleblower dispute to unmask Aurelius. Axos engaged the assistance of the law firm Sheppard, Mullin, Richter & Hampton LLP ("Sheppard Mullin"), in its efforts to unmask Aurelius.

21.    First, in December 2015, Axos, through Sheppard Mullin, served a subpoena on Seeking Alpha. The subpoena demanded that Seeking Alpha provide the identity of various bloggers publishing critical research on Axos. Axos moved to compel Seeking Alpha to produce Aurelius' identity but lost on First Amendment grounds.[2]

22.    Having failed in its first effort to unmask Aurelius, Axos tried a different route. In January 2016, Axos issued a subpoena on Dropbox, Inc. demanding that Dropbox provide the identity of Aurelius. Aurelius had used Dropbox to disseminate some of his/her research findings. Dropbox turned over Aurelius' Internet Protocol ("IP") address in response to this subpoena.

23.    In May 2016, Axos served Aurelius' internet service provider ("ISP") – an unmasked, residential ISP called CenturyLink based in Minnesota – demanding the identity of

---

[2] *BofI Federal Bank v. Seeking Alpha, Inc.*, Case No. 1:16-mc-00025 (S.D.N.Y. 2016).

Aurelius. In June 2016, Aurelius, appearing anonymously, moved to quash the subpoena seeking his/her identity.[3] Aurelius prevailed on First Amendment grounds, with the court ruling that his/her speech was protected.[4]

24.     Axos, and by extension its law firm Sheppard Mullin, was therefore aware of Aurelius' IP address dating back to at least May 2016. In fact, Axos included Aurelius' IP address in its moving papers filed in the Central District of California as part of *Aurelius v. Bofi Federal Bank*.[5] At all times since May 2016, Axos and Sheppard Mullin have been aware that the IP address in their possession traced Aurelius to Minneapolis, Minnesota, a location hundreds of miles away from the location of any Sparrow principal. Further, the IP address was unmasked and could not, therefore, be disregarded as an artificial or "dummy" IP address used by somebody else to hide its location.

## HAVING PROMISED ITS INVESTORS IT WOULD BRING AURELIUS TO JUSTICE QUICKLY, MIMEDX HIRED AXOS' LAW FIRM TO TARGET AURELIUS

25.     On September 29, 2017, MiMedx had publicly promised its shareholders that it would sue Aurelius. But MiMedx admitted that it did not know the identity of Aurelius nor did it have any clues as to the identity of Aurelius.

26.     MiMedx was aware by this time of Axos' very public campaign against Aurelius. Both companies had been targeted by Aurelius and both companies had promised action against him/her.

---

[3] *Aurelius v. BofI Federal Bank*, Case No. 2:16-mc-00071-DSF-FFM (C.D. Cal. 2016) ("*Aurelius v. BofI*").
[4] *Aurelius v. BofI*, ECF No. 25.
[5] *See Aurelius v. BofI*, ECF No. 15-29.

27.     And so, MiMedx hired Axos' law firm, Sheppard Mullin, to bring suit against Aurelius. In fact, MiMedx hired the same attorney from within Sheppard Mullin that had previously represented Axos in its attempts to unmask Aurelius.

28.     Given MiMedx's stated interest in the matter and its promises to shareholders to bring Aurelius to justice, MiMedx was aware of Aurelius' IP address. Moreover, it is implausible that Sheppard Mullin – who had represented Axos in obtaining Aurelius' IP address and in attempting to unmask him – did not share with MiMedx what it had learned about Aurelius during the course of its representation.

### YET, DESPITE KNOWING THE PRECISE IP ADDRESS AND LOCATION OF AURELIUS, MIMEDX BRINGS SUIT AGAINST SPARROW – AN ENTITY IT KNEW HAD NO CONNECTION TO THE IP ADDRESS

29.     On October 4, 2017, MiMedx, represented by Sheppard Mullin, brought suit against Sparrow, i.e., the MiMedx Lawsuit, claiming – without any factual basis whatsoever – that Sparrow is Aurelius. The suit came only three business days after MiMedx publicly admitted that it did not know the identity of Aurelius, and a mere ten business days after the original Aurelius post about MiMedx on September 20, 2017.

30.     In the MiMedx Lawsuit, MiMedx alleged that "Aurelius Value is actually one or more of Sparrow's partners or employees, posting under a pseudonym for the benefit of themselves and/or Sparrow." In fact, throughout the complaint, MiMedx uses the names "Sparrow" and "Aurelius" interchangeably. Further, MiMedx boldly alleges that "[i]n an all-out effort to ensure that they would profit from their negative investments, Defendants [including Sparrow] have maliciously disseminated materially false, misleading and defamatory statements about MiMedx and its employees to shareholders and the investing public, intending to fraudulently manipulate the market for MiMedx's stock and to allow Defendants [including Sparrow] to reap enormous

8

profits from the resulting price decline." Throughout the complaint, MiMedx describes Sparrow as having engaged in "illegal," "manipulative," and "fraudulent" conduct.

31.     MiMedx's statements were and remain false. Sparrow is not, nor ever has been, Aurelius. No Sparrow partner or employee is, or ever has been, Aurelius. No one associated with Sparrow is, or ever has been, Aurelius. Nor has Sparrow engaged in any criminal conduct, much less the type of illegal market-manipulating behavior MiMedx has alleged.

32.     Curiously, Axos and Sheppard Mullin were unable to ascertain the identity of Aurelius after almost two years of effort. Yet MiMedx, with the help of Sheppard Mullin, was able to apparently pinpoint the identity of Aurelius within the course of ten business days.

33.     But perhaps more remarkably, MiMedx's half-baked conclusion that Sparrow is Aurelius contradicted its own intel. Axos, through Sheppard Mullin, had previously obtained the IP address for Aurelius, which demonstrated s/he was based in Minnesota. That information was and remains public information. Yet, in the MiMedx Lawsuit, MiMedx expressly acknowledged and alleged that Sparrow's principals all lived in either New York or California, not Minnesota. (MiMedx Lawsuit, ¶ 15). Again, it is inconceivable that MiMedx was unaware of Aurelius' IP address at the time it filed the MiMedx Lawsuit or that Sheppard Mullin did not share that information with MiMedx.

### MIMEDX SUED SPARROW, NOT BECAUSE IT BELIEVED IT WAS AURELIUS, BUT BECAUSE IT BELIEVED IT COULD COERCE FROM SPARROW AURELIUS' IDENTITY

34.     MiMedx had not in fact identified Aurelius. In fact, MiMedx still had no clue who Aurelius was, as evidenced by the paper trail that immediately followed the initiation of the suit.

35.     Rather, MiMedx targeted Sparrow because it learned from Sheppard Mullin that one of Sparrow's principals, Nathan Koppikar, had blogged about Axos in the past at the same

time Aurelius was blogging about Axos,[6] and therefore, it concluded, must have information about Aurelius' identity.

36.     In other words, MiMedx specifically targeted Sparrow, not because it believed Sparrow is Aurelius (it affirmatively knew it is not), but because it believed it could, through the threat of defamation and harassment, coerce from Sparrow Aurelius' identity.

37.     Sparrow was a small, startup investment fund with limited resources. Investment funds' primary asset in their early stages is their reputation. MiMedx knows that. Sparrow, therefore, represented the perfect class of victim for MiMedx's scheme: Sue a small start-up fund with limited resources that it believes might have knowledge of Aurelius' identity and then leverage the threat of defamation and expensive litigation to extract that information.

38.     There is no doubt this was MiMedx's motive, as its subsequent actions made absolutely clear.

### DEFENDANT REVEALS ITS ULTERIOR MOTIVES FOR THE MIMEDX LAWSUIT AND THEN TAKE OUTLANDISH POSITIONS IN LITIGATION TO JUSTIFY ITS BASELESS SUIT

39.     Almost immediately after MiMedx filed suit against Sparrow, Sparrow provided affidavits from all of its three employees attesting under oath that no one from Sparrow is Aurelius or is connected to Aurelius in any way.

40.     But that was not enough for MiMedx because Defendant never believed Sparrow is Aurelius. It only ever wanted to defame and maliciously prosecute Sparrow as a means of coercing from it Aurelius' identity. So, even after Sparrow provided the affidavits, MiMedx refused to drop the Lawsuit and instead demanded that Sparrow's principals attest under oath that

---

[6] Between early 2016 and July 2017, Axos informed Mr. Koppikar that it was aware that he was blogging under the moniker, "The Friendly Bear," and proceeded to serve numerous subpoenas on Mr. Koppikar seeking Aurelius' identity, apparently on the belief that the blogging community is small and that, therefore, Mr. Koppikar must know who Aurelius is.

it did not know the identity of Aurelius. It is clear Defendant was, at that point, overtly using the threat of continued litigation to coerce from Sparrow the identity of Aurelius, rather than actually believing Sparrow is Aurelius or that its lawsuit was grounded in good faith allegations.

41.     It was clear almost immediately after MiMedx filed suit against Sparrow that it was fully aware it had sued the wrong party. But MiMedx also made clear it intended to use its defamatory campaign to extract any possible information related to Aurelius from Sparrow, thereby circumventing the First Amendment roadblocks Axos had earlier encountered in attempting to unmask Aurelius.

42.     After MiMedx refused to drop its suit despite being in possession of sworn affidavits from all of Sparrow's employees that it was not Aurelius, Sparrow filed a Rule 11 sanctions motion against Defendant.

43.     Only after filing the Rule 11 sanctions motion did MiMedx attempt to justify its lawsuit, proffering a clearly manufactured and half-baked pre-filing investigation. Defendant described an elaborate investigation that included multiple forensic linguists and a private investigator that had all apparently taken place in the time period between Aurelius' first post about MiMedx on September 20, 2017 and the filing of the suit on October 4, 2017. That is a span of ten business days – an implausibly short time to conduct such a thorough investigation. And, even more curiously, MiMedx had apparently been able to succeed in only ten business days where MiMedx's own law firm had been unsuccessful over the course of almost two years while working for Axos.

44.     When defending against Rule 11 sanctions, MiMedx claimed to have engaged world-renowned forensic investigators who analyzed internet metadata and linguistic styles. MiMedx claimed to have engaged experts adept at identifying anonymous online parties.

Nonetheless, MiMedx did not once admit that it was in possession of Aurelius' IP address when it first initiated the suit against Sparrow. Given that MiMedx was represented by the same law firm that had represented Axos in obtaining Aurelius' IP address and given that the IP address was disclosed in public documents, it is inconceivable MiMedx was not aware of that IP address. MiMedx kept this information hidden from the Court because it would have established that Sparrow could not possibly have been the author of Aurelius' blog posts because none of Sparrow's three employees had any ties to Minneapolis, Minnesota.

45.    Unsurprisingly, MiMedx has never produced any evidence of its so-called forensic investigation.

46.    Moreover, the description of the pre-filing investigation does not pass any level of muster. MiMedx claimed the basis for its conclusion was that the writing styles of The Friendly Bear – Mr. Koppikar's moniker on Seeking Alpha – and Aurelius Value were similar, and therefore they must be the same person. Yet, the user agreement of Seeking Alpha clearly states that its users "may only maintain a single account" and prohibits its users from authorizing others to use their accounts. Furthermore, Seeking Alpha actively monitors IP addresses to ensure that its authors are not posting under multiple pseudonyms. Thus, MiMedx's supposed investigation cannot stand on its own two feet, because The Friendly Bear and Aurelius, by the very terms of Seeking Alpha, cannot be the same person. Any supposedly in-depth forensic investigation into posts on Seeking Alpha would have revealed the basic terms of Seeking Alpha's user policies thereby demonstrating the inherently flawed, and logically impossible, conclusions of the investigation.

47.    In November 2017 in a letter to the SEC, Petit stated publicly that the company was "still perfecting its case against hidden entities" when discussing Aurelius, acknowledging that

MiMedx still did not know actually know the identity of Aurelius despite publicly maintaining that it did in the MiMedx Lawsuit.

48.     It is clear that MiMedx never had any idea who Aurelius was when it filed its suit and was in fact sitting on compelling forensic evidence that clearly established that no one from Sparrow could have possibly been Aurelius.

49.     MiMedx nonetheless still refused to drop its suit, issuing a press release after Judge Parker's ruling (recommending dismissal of the MiMedx Lawsuit) stating that the "Magistrate's recommendations are in error."

50.     MiMedx was simply unwilling to drop the suit because it believed it could still coerce from Sparrow Aurelius' identity through fear of continued defamation and oppressive litigation.

## DEFENDANT FOLLOWS UP ITS SHAM LAWSUIT WITH A DEFAMATION CAMPAIGN AGAINST SPARROW

51.     The original sham lawsuit against Sparrow coincided with a campaign to defame Sparrow, with MiMedx repeatedly falsely claiming that Sparrow was engaged in criminal activities and/or securities fraud.

52.     On or about October 4, 2017, Petit publicly stated with regard to the defendants in that lawsuit:

> "We contend the defendants *knowingly concocted and disseminated false statements* against MiMedx and our employees to our shareholders, the investment community and the public at large. To *manipulate the market* and serve their financial interest in driving down the price of MiMedx stock, they made these misleading statements. In their baseless statements, they either purposely omitted facts or context favorable to MiMedx, made suggestions concerning the Company that ran counter to the facts known by the defendants, or refused to do any informational and fact-finding due diligence, but just published any information that supported their conspired short thesis.
>
> We believe these types of *illegal short attacks* are ultimately short term in nature when the fundamentals of a business such as MiMedx are strong. Eventually, the

constant outstanding performance delivered by MiMedx cannot be ignored. Unfortunately, in the meantime, honest shareholders may be deceived and harmed by the loss of their investment value, while dishonest individuals and entities are able to *profit through manipulation*." (Emphasis added).

53.     And on October 3, 2017, MiMedx filed a 10Q with the SEC in which it expressly claimed Sparrow is Aurelius.

54.     Even in the face of affidavits from each Sparrow principal attesting nobody from Sparrow is Aurelius and even in the face of a motion to dismiss and a Rule 11 motion for sanctions, MiMedx refused to modify or correct or retract its allegation that Sparrow is Aurelius. There was no ambiguity in MiMedx's false message to the public that Sparrow is Aurelius.

55.     In fact, on the very day the MiMedx Lawsuit was filed, at least one investment fund contacted Sparrow expressing their belief that Sparrow is Aurelius based on the allegations of the MiMedx Lawsuit.

56.     In the period following the filing of the MiMedx Lawsuit, numerous stock traders on Twitter (the main online venue for stock traders) expressed their belief that Sparrow is Aurelius.

57.     Several months after the MiMedx Lawsuit was filed, a separate firm contacted Sparrow inquiring for "Aurelius."

58.     Worse, Sparrow was unable to attract investment following the filing of the MiMedx Lawsuit because investors were deterred by allegations of illegal market manipulation, further demonstrating that the public took Defendant's defamatory remarks to be direct references to and of concerning Sparrow.

**MIMEDX'S EFFORTS TO COVER UP ITS PROBLEMS WITH THE SEC UNRAVEL, AS THE COMPANY IS FORCED TO ADMIT THAT ITS FINANCIALS ARE UNRELIABLE; IT REMAINS UNDER INVESTIGATION;**

## ITS OFFICERS WERE TERMINATED FOR CAUSE; AND IT IS IN THE MIDDLE OF A FAR-REACHING BRIBERY SCANDAL

59.     The SEC investigation into MiMedx commenced in February 2017. But by September 2017, MiMedx had lost control of the narrative surrounding its interactions with the SEC as a result of bloggers such as Aurelius. Its prior investigation into internal wrongdoing was also exposed as a sham by Aurelius. Since then, the company's fortunes have unraveled rapidly and have exposed a culture of mismanagement and rampant fraud.

60.     In February 2018, Bloomberg reported that Manhattan prosecutors and the FBI had opened a criminal investigation into MiMedx.

61.     On May 8, 2018, the federal district court for the District of South Carolina unsealed an indictment accusing Donna Becker, Marcela Dolores Farrer, and Carol Guardiola of violating 18 U.S.C. 208, 201, and 1347. The indictment alleges the defendants, former employees of the Department of Veteran Affairs and healthcare providers, accepted bribes from MiMedx in exchange for increasing sales of MiMedx products to VA facilities.

62.     On June 7, 2018, MiMedx finally conceded that, contrary to its previous unequivocal statements, the Company's financial reporting in fact was incorrect and unreliable. Specifically, the Company stated that its previously issued financial statements dating back to 2012 required restatement and should not be relied upon. The need to restate arose from revenue recognition improprieties, the exact issues described by Aurelius and others in late 2017 that MiMedx so aggressively denied.

63.     Between June and July 2018, MiMedx's CEO Petit, CFO Mike Senken, Treasurer & Controller John Cranston, and COO Bill Taylor all resigned from the company

64.     In September 2018, MiMedx reclassified the aforementioned resignations as "terminations for cause" and stated that its Board would take action against those executives to

recover compensation previously paid to them. MiMedx stated its determination to terminate the officers "for cause" was "based on information as part of the Audit Committee's ongoing independent investigation [i.e., the investigation into the inflated revenue practices]," and that the executives had "engaged in, among other things, conduct detrimental to the business or reputation of the Company." On information and belief, the MiMedx Lawsuit was an example of such conduct.

65.     In November 2018, MiMedx was delisted from the NASDAQ.

66.     In December 2018, MiMedx's outside auditor Ernst & Young resigned as auditor because Ernst & Young did not feel that the company was being forthcoming.

67.     MiMedx has still not retained a new outside auditor. The fraud at MiMedx has engulfed the company and left it in shambles. The company still has no full time CEO.

68.     Investors have brought at least two class action lawsuits against MiMedx in the federal district court for the Northern District of Georgia. Investors have also brought a derivative shareholder lawsuit in that same court. The allegations of that lawsuit spell out in great detail the history of MiMedx's public deceptions regarding its accounting and business practices. *In re MiMedx Group, Inc. Shareholder Derivative Litigation*, United States District Court, Northern District of Georgia, Case No. 1:18-cv-04486-WMR, ECF No. 37.

### THIS COURT DISMISSED THE MIMEDX LAWSUIT AGAINST SPARROW, RULING THERE WAS NO BASIS FOR THE ALLEGATIONS

69.     On September 29, 2018, this Court dismissed the MiMedx Lawsuit, and specifically the allegations against Sparrow, adopting Magistrate Judge Katharine H. Parker's Report and Recommendations recommending the same. The Court, adopting and quoting the Report and Recommendations, found there was "no factual support whatsoever" for the allegation that Sparrow is Aurelius.

70.     The Court granted MiMedx leave to amend its lawsuit, though unsurprisingly –
given the complete lack of evidence tying Sparrow to Aurelius – MiMedx did not opt to amend.

71.     By filing the MiMedx Lawsuit and then parading the allegations around in press
releases and other public forum, MiMedx initiated a campaign to defame and ruin Sparrow, falsely
claiming it was engaged in illegal and criminal short selling activities. As it concerns the
allegations against Sparrow, the sole purpose of the MiMedx Lawsuit was to defame Sparrow.

72.     MiMedx has no evidence that Sparrow has done anything illegal or criminal, yet
MiMedx has made false claims and acted with reckless disregard for the truth in making numerous
defamatory statements about Sparrow. Further, MiMedx has acted with actual malice in its public
representations regarding Sparrow.

73.     Furthermore, Defendant's statements were not mere rhetoric or hyperbole. In a
business update call with investors on September 21, 2017, Petit made the following statement
regarding Defendant's responsibilities in making public statements:

> "First, I think you would benefit from a little background on responsibilities I have
> as a public company officer versus those that the short sellers have. First, there are
> well defined regulations and laws associated with comments that I make or our
> company makes as to their authenticity. *If we misrepresent facts or lie, as a
> company official, can go to jail and certainly be fined.* On the other hand, the
> individuals who involve with short selling do not have those same laws and
> regulations to constrain them. Yes, they have to cope with laws that they pay for,
> obtain inside information of the manipulated stock, but certainly you see those kind
> of actions taken by federal agencies against short sellers." (Emphasis added).

**SPARROW IS NOT A GENERAL OR LIMITED PURPOSE PUBLIC PERSON**

74.     MiMedx is mired in controversy and in a very public battle with short sellers that
have publicly alleged the company is engaged in fraud. Sparrow did not invite itself into the
controversy surrounding MiMedx and therefore is not a public figure. To the contrary, Sparrow is
a relatively small investment firm of only three employees that is not even required to be SEC
registered.

## SPARROW HAS SUFFERED CONCRETE HARM ABOVE AND BEYOND
## THE BURDENS OF DEFENDING THE FRIVOLOUS LAWSUIT

75.     Defendant's campaign to destroy Sparrow was successful. Sparrow is a small, startup investment fund. Being accused of illegal and criminal behavior is devastating in such a stage of a fund's development. Sparrow's primary asset was its reputation. And immediately following filing of the MiMedx Lawsuit, Sparrow was unable to attract necessary operating and investment capital.

76.     Prior to the filing of the MiMedx Lawsuit between early 2016 and early October 2017, Sparrow procured approximately $60 million in institutional investment capital. Following the filing of the MiMedx Lawsuit and as a result thereof, it procured none.

77.     As a result, Sparrow could not support its overhead. In 2017, Sparrow generated over $5 million in revenues. By 2018 that figure was down by 60% as a result of the MiMedx Lawsuit, which prevented Sparrow from raising additional institutional fee-paying capital.

78.     Sparrow was unable to attract any more investment because of suspicions – manufactured and fueled by MiMedx – that it was engaging in illegal market manipulation. Indeed, a simple Google search for "Sparrow Fund Management" at the time would have resulted in pages of lawsuit references and defamatory comments made by MiMedx directed towards Sparrow.

79.     In fact, despite generating a 26% return in 2017, an incredibly strong result that should have resulted in a flurry of investor interest, Sparrow attracted 65% fewer prospective investors in the year following the filing of the MiMedx Lawsuit, as compared to the approximately six months prior to the filing of the MiMedx Lawsuit. Sparrow was no longer able to attract prospective investors, not because of performance or other economic indicators (indeed, all other indicators were positive), but as a direct result of the negative publicity, taint, and suspicions created by the MiMedx Lawsuit and Defendant's defamatory statements.

80.     Also, as a direct result of the MiMedx Lawsuit, Sparrow's relevant insurance premiums, and deductible, increased. Further, after the MiMedx Lawsuit was filed, one of Sparrow's partners left the company, but because he had previously spent significant money defending against the MiMedx Lawsuit, Sparrow was forced to provide him a higher payout than it would have otherwise had to do (because the departing partner demanded compensation for the amount he spent on the legal defense).

81.     On top of this, defending against the MiMedx Lawsuit diverted attention and capital away from management of the fund. In fact, Sparrow had to pay significant percentages of its annual revenues to attorney fees and legal costs to defend against a lawsuit that never should have been brought.

82.     The principals of Sparrow suffered embarrassment, humiliation, damage to their reputations, and financial harm as a result of the MiMedx Lawsuit and the defamatory statements.

83.     Sparrow's principals were forced to make personal loans to Sparrow due to the damage caused to Sparrow's business as a result of the MiMedx Lawsuit and Defendant's defamatory statements.

84.     As a direct result of the MiMedx Lawsuit, Sparrow was forced to close its doors, with the partnership going from a $5 million-revenue entity immediately prior to the MiMedx Lawsuit to being out of business by 2018. Sparrow has suffered millions in damages and, in any event, well more than $75,000.00.

## COUNT I – DEFAMATION PER SE

85.     Sparrow re-alleges paragraphs 1 through 84.

86.     Sparrow enjoyed a good reputation within the investment management community. Sparrow further enjoyed good relations with its investors and contacts within the investment management community.

87.     By making repeated false statements (both written and oral) accusing Sparrow of being Aurelius and of engaging in "criminal" and "illegal" behavior, Defendant intended to and did communicate and publish to others both within and without the investment management community false statements about Sparrow's business activities and professional integrity.

88.     Defendant's statements were and remain false. Sparrow is not Aurelius Value and has not engaged in criminal behavior, much less the criminal behavior Defendant has alleged.

89.     By making its repeated false statements, Defendant intended to and did injure Sparrow's business reputation and disparage its business.

90.     Defendant's statements were defamatory *per se* because: 1) the statements were and are in printed form and are thus libel; 2) the statements were also communicated orally and thus slander; 3) the statements ascribe characteristics that have a tendency to injure and have in fact injured Sparrow in its business and occupation; and 4) the statements claim Sparrow engaged in criminal and illegal conduct.

91.     Further, MiMedx is not entitled to any privilege because the MiMedx Lawsuit itself was a sham lawsuit filed for improper purposes and to defame Sparrow. Therefore, any allegations therein and any reports thereof are not protected by any privileges. *Williams v. Williams*, 23 N.Y.2d 592, 599 (1969). Defendant made statements to the general press and other non-participants in the litigation that neither served the purpose of furthering MiMedx's underlying litigation in the Southern District of New York nor had any logical connection to that action. "Litigating in the press" does not serve the purpose of the privilege.

92.     Sparrow has suffered damages directly and proximately caused by Defendant's defamatory actions, including but not limited to loss of business opportunities, damage to reputation, and loss of revenue in an amount that is currently unknown but not less than $20

million. By reason of Defendant's defamation, Sparrow is entitled to both general damages and all actual and compensatory damages proved at the time of trial.

93.     At all times relevant, Defendant acted with malice and fraudulent motive, recklessness, and "deliberate disregard of the interests" of Sparrow. Sparrow is, therefore, entitled to an award of exemplary and punitive damages hereunder.

94.     For Defendant's conduct, Sparrow seeks preliminary and permanent injunctive relief against Defendant.

## COUNT II – MALICIOUS PROSECUTION

95.     Sparrow re-alleges paragraphs 1 through 84.

96.     Defendant both initiated and continued a lawsuit against Sparrow, alleging Sparrow was and is Aurelius, and did so without probable cause. Defendant had no reason to equate Sparrow with Aurelius. Defendant could not provide evidence of such. It did not provide evidence of such. And it has misrepresented to the Court and the parties its basis for so doing. Defendant had no reasonable basis or probable cause for naming Sparrow as Aurelius and accusing Sparrow of illegal market manipulation.

97.     The MiMedx Lawsuit was dismissed, and the Court entered judgment in favor of Sparrow on November 7, 2018.

98.     Defendant filed its lawsuit with malice. Defendant had no reason to believe Sparrow is Aurelius and, in fact, knew that Sparrow is not Aurelius. Additionally, it had no good reason to refute Aurelius' allegations, which the public now knows were factual. Nevertheless, as a means of coercing from Sparrow Aurelius' identity, Defendant defamed and maliciously filed and pursued its lawsuit against Sparrow.

99.     As a result of Defendant's malicious prosecution, Sparrow suffered concrete harm or special injury in that the MiMedx Lawsuit directly resulted in substantial and identifiable

interference with Sparrow's business operations. Following the MiMedx Lawsuit and as a direct result thereof, Sparrow was unable to attract institutional investment. As a direct result of the MiMedx Lawsuit, Sparrow's ability to attract even investor meetings was severely diminished. Sparrow was assessed higher insurance premiums and deductibles as a result of the MiMedx Lawsuit, and Sparrow was forced to pay a larger pay out to a departing partner as a result of the MiMedx Lawsuit. Its resources were devoted to defending a meritless lawsuit. As a direct result of the MiMedx Lawsuit, Sparrow lost millions of dollars and had to shut down its business.

100.    At all times relevant, Defendant acted with malice and fraudulent motive, recklessness, and "deliberate disregard of the interests" of Sparrow. Sparrow is, therefore, entitled to an award of exemplary and punitive damages hereunder.

WHEREFORE, Sparrow prays that the Court grant it the following relief against Defendant:

A.  As to Count I, damages in an amount to be proved at trial but not less than $20,000,000.00, and preliminary and permanent injunctive relief;

B.  As to Count II, damages in an amount to be proved at trial but not less than $20,000,000.00;

C.  As to all Counts, punitive damages in an amount to be proven at trial but not less than $50,000,000.00;

D.  As to all Counts, pre- and post-judgment interest;

E.  Costs; and

F.  Any other relief available at law or equity.

Dated: April 3, 2020.

Respectfully submitted,

**BRESSLER, AMERY & ROSS, P.C.**

/s/ Nikolas S. Komyati
Nikolas S. Komyati, NYB #4298188
nkomyati@bressler.com
Bressler, Amery & Ross, P.C.
17 State Street
New York, NY 10004
Tel: 212-425-9300 | Fax: 212-425-9337

**HARRIS BERNE CHRISTENSEN LLP**

/s/ Adam S. Heder
Adam S. Heder, CSB #270946, OSB #151144
adamh@hbclawyers.com
Harris Berne Christensen LLP
15350 SW Sequoia Parkway, Suite 250
Portland, OR 97224
Tel: 503-968-1475 | Fax: 503-968-2003
*Admitted pro hac vice*

*Counsel for Plaintiff Sparrow Fund Management, LP*